UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE


**DAVID KIMBROUGH**
    Plaintiff

**v.**                                                                                             **No. 3:10CV-00751-H**

**MICHAEL ASTRUE**
    Commissioner of Social Security
    Defendant


**MAGISTRATE JUDGE'S REPORT**
**and RECOMMENDATION**

This matter is before the court upon the plaintiff's complaint seeking judicial review of the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g). The plaintiff is represented by Alvin Wax. At the administrative level, he was represented by Shannon Fauver. The fact and law summaries of the plaintiff and the defendant are at Docket Entry Nos. 12 and 13, respectively. This matter has been referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636.

The final decision of the Commissioner was rendered on February 19, 2010, by administrative law judge (ALJ) Emery Curlee. In support of his decision denying Title II and Title XVI benefits, Judge Curlee entered the following numbered findings:

    1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2010.

    2. The claimant has not engaged in substantial gainful activity since May 12, 2005, the alleged onset date (20 CFR 404.1571 et seq. and 416.971 et seq.).

    3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b).

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on November 23, 1956, and was 48 years old, a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," irrespective of whether the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 12, 2005, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Administrative Record (AR), pp. 31-35).

**Governing Legal Standards**

1. The court has jurisdiction to examine the record that was before the Commissioner on the date of the Commissioner's final decision and to enter a judgment affirming, modifying, or reversing that decision. 42 U.S.C. § 405(g), sentence four. In exercising its "sentence four" jurisdiction, the court is limited to determining whether the Commissioner's controlling findings are supported by substantial evidence and whether the Commissioner employed the proper legal

standards in reaching his decision. *Richardson v. Perales*, 402 U.S. 389 (1971). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Kirk v. Secretary*, 667 F.2d 524 (6th Cir., 1981). It has been described as a sufficient amount of evidence "to justify, if the trial were to a jury, a refusal to direct a verdict." *Sias v. Secretary*, 861 F.2d 475, 480 n. 1 (6th Cir., 1988). In determining whether the Commissioner's findings are supported by substantial evidence, the court must examine the evidence in the record taken as a whole and must take into account whatever in the record fairly detracts from its weight. *Wyatt v. Secretary*, 974 F.2d 680 (6th Cir., 1992). However:

> The substantial-evidence standard allows considerable latitude to administration decision makers. It presupposes that there is a zone of choice within which the decision makers can go either way, without interferences by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.

*Mullen v. Secretary*, 800 F.2d 535, 545 (6th Cir., 1986).

When conducting substantial evidence review, the court is restricted to a consideration of the evidence that was before the Commissioner on the date of the final decision. When the Appeals Council declines to review the ALJ's decision and render a new decision, the ALJ's decision becomes the Commissioner's final decision. *Cotton v. Secretary*, 2 F.3d 692 (6th Cir., 1993).

2. To be entitled to disability insurance benefits (DIB), a claimant must be under the age of 65 years, must meet the insured status requirements of Title II of the Social Security Act, and must be under a disability as defined by the Act. To qualify for supplemental security income (SSI) benefits, a claimant must file a Title XVI application, must have insufficient earnings and other

3

financial resources, and must be under a disability as defined by the Act. The determination of disability is essentially the same for Title II and Title XVI purposes.

    3. Disability determination is a five-step sequential evaluation process, to-wit:

**STEP #1** The claimant must not be engaged in substantial gainful activity.

**STEP #2** The alleged disabling impairment must be "severe." A severe impairment is one that "significantly limits" a claimant's ability to do "basic work activities [that are] necessary to do most jobs [such as] walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." 20 C.F.R. §§ 404.1521 and 416.921. Only a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience" is deemed to be non-severe. *Farris v. Secretary*, 773 F.2d 85, 89-90 (6th Cir., 1985). Any physical or mental impairment that has more than a <u>de minimis</u>, or significant, effect on the claimant's ability to work is severe, and the sequential evaluation should proceed to Step #3. Nevertheless, the severity step can and should continue to function as an "administrative convenience to screen out claims that are totally groundless solely from a medical standpoint." *Higgs v. Secretary*, 880 F.2d 860, 863 (1988). In addition, the severe impairment must satisfy the so-called duration requirement, to-wit, the impairment must be expected to result in death or "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. §§ 404.1509 and 416.909.

**STEP #3** If the claimant has a medical condition that meets or exceeds the criteria for an impairment defined in Appendix 1 of 20 C.F.R. Part 404, Subpart P of the regulations ("the Listing"), a conclusive presumption attaches that the claimant is disabled.

4

**STEP #4** The claimant must not be able to perform his past relevant work either as he actually performed it or as it generally performed in the national economy.

**STEP #5** If the claimant makes a <u>prima facie</u> showing that he cannot perform his past relevant work, the burden of going forward with evidence shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can perform. *Richardson v. Secretary*, 750 F.2d 506, 509 (6th Cir., 1984). If the evidence supports a finding that the claimant's age, education, work experience, and residual functional capacity (used to determine the claimant's maximum sustained work capability for sedentary, light, medium, heavy or very heavy work as defined by 20 C.F.R. §§ 404.1567 and 416.967) coincide with <u>all</u> the criteria of a particular rule of Appendix 2 of Subpart P, the Commissioner must decide whether the claimant is disabled in accordance with that rule. Section 200.00(a) of Appendix 2; 20 C.F.R. §§ 404.1569a(b) and 416.969a(b).

    If the claimant is found to have, in addition to the exertional impairments resulting in his maximum residual strength capabilities, nonexertional limitations, e.g., mental, sensory, or skin impairments, postural or manipulative limitations, and environmental restrictions; the Commissioner may rely on the particular rule only as a "framework for decisionmaking." Section 200.00(e)(1) and (2) of Appendix 2; 20 C.F.R. §§ 404.1569a(d) and 416.969a(d); *Kimbrough v. Secretary*, 801 F.2d 794 (6th Cir., 1986). Accordingly, the focus of judicial review in Step #5 cases is typically whether the controlling hypothetical posed to the vocational expert reflected all vocationally significant physical and mental limitations actually suffered by the claimant. *Varley v. Secretary*, 820 F.2d 777 (6th Cir., 1987). If the claimant is found to have, in addition to the exertional impairments resulting in his maximum residual strength capabilities,

nonexertional limitations, e.g., mental, sensory, or skin impairments, postural or manipulative limitations, and environmental restrictions; the Commissioner may rely on the particular rule only as a "framework for decisionmaking." Section 200.00(e)(1) and (2) of Appendix 2; 20 C.F.R. §§ 404.1569a(d) and 416.969a(d); *Kimbrough v. Secretary*, 801 F.2d 794 (6th Cir., 1986). Accordingly, the focus of judicial review in Step #5 cases is typically whether the controlling hypothetical posed to the vocational expert reflected all vocationally significant physical and mental limitations actually suffered by the claimant. *Varley v. Secretary*, 820 F.2d 777 (6th Cir., 1987).

## **Listing 1.04(A)**

The plaintiff argues that he is entitled to a conclusive presumption of disability at step 3 of the sequential evaluation process because his low back impairment meets or equals the medical criteria of Listing 1.04(A) of Appendix 1 of the regulations. If the plaintiff shows that his impairment satisfies the following clinical criteria, he is entitled to an ultimate finding of disability *(emphasis added)*:

> 1.04 **Disorders of the spine** (e.g., herniated nucleus pulposus, spinal arachnoiditis, **spinal stenosis**, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by [1] neuro-anatomic distribution of pain, [2] limitation of motion of the spine, [3] motor loss (atrophy with associated muscle weakness or muscle weakness) [4] accompanied by sensory or reflex loss and, [5] if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

According Charles T. Hall, Social Security Disability Practice: A Lawyer's Perspective, commentary on Listing 1.04:

> Part A of this Listing is virtually impossible to meet. It is a laundry list of almost all signs of an acute low back problem that might require immediate hospitalization and surgery. It is not a description of many people suffering from chronic low back pain.

An MRI of the plaintiff's lumbar spine from August of 2005, revealed among other things, "spinal stenosis" at the L4-L5 and L5-S1 levels (AR, p. 275). Hence, the plaintiff appears to suffer from one of the "disorders of the spine" contemplated by the Listing. In November of 2005, he complained to Ricky Collis, M.D., of shooting pain from his back down his legs (AR, p. 238). In December of 2005, Dr. Collis made the following clinical observations, which the plaintiff argues satisfied the "Part A" criteria, [1] through [5], <u>supra</u> (AR, p. 235):

> Today on examination, he is awake, alert and oriented. Appearing in mild distress. Sitting in the examining chair, he walks with a limp favoring his right lower extremity. There is decreased sensation in the L-4 and L-5 distribution to light touch and pinprick. Positive straight leg raise test as well and continued decreased reflexes of the patellar and Achilles on the right. Straight leg raise elicits pain from the back down to the calf at 45 degrees. There is still decreased forward flexion as well as extension of the lumbar spine. There is a significant amount of paraspinal muscle spasm and tenderness in the paraspinal muscles in the lower lumbar region. ... The patient has significant signs of radiculopathy such as dermatomal pain and/or dermatomal distribution sensory loss and loss of relevant reflexes and loss of muscle strength as well.

Dr. Collis apparently treated the plaintiff for three months in late 2005, shortly after he was involved in an automobile accident in July of 2005 (AR, pp. 235-240). The magistrate judge concludes that the foregoing fails to satisfy the Listing because, even if Dr. Collis' findings satisfied the Listing in 2005, Listing 1.00H1 provides as follows *(emphasis added)*:

> Musculoskeletal impairments frequently improve with time or respond to treatment. Therefore, a **longitudinal clinical record** is generally important for the assessment of severity and expected duration of an impairment unless the claim can be decided favorably on the basis of the current evidence.

The plaintiff has failed to provide a "longitudinal clinical record" satisfying the severity and duration requirements of the Listing.

We further conclude that the "Part A" criteria are not satisfied in this case for the following reasons:

7

1. With respect to the "neuro-anatomic distribution of pain" requirement, Anthony Gawienowski, <u>Establishing Presumptively Disabling Low Back Impairments</u>, gives the following example of an individual who, like the plaintiff, alleges disabling nerve root compression at the L5/S1 level:

> What is the neuro-anatomic distribution of pain? Well, each spinal nerve affects different areas of the body. So, if one wants to establish the existence of nerve root compression in the area between the 5th lumbar vertebrae and the 1st sacroiliac vertebrae (the L5/S1 level), the pain and corresponding symptoms should follow the same path as the nerves at the L5/S1 level. Practically speaking, if an MRI shows a herniated disc at L5/S1, the corresponding low back pain should, to some degree, radiate into the buttock, posterior thigh and calf. Coughing, sneezing or the Valsalva maneuver may aggravate the radiating pain. Bending or sitting will characteristically accentuate the pain, and lying down will characteristically relieve the pain. Most commonly, the back pain is described as deep, aching, and constant back pain that is termed "lumbago," while the sharp shooting pain traveling from the buttock down the leg posteriorly to the foot or toes is termed "sciatica."

The plaintiff has failed to identify such evidence in the administrative record.

2. With respect to the "limitation of motion of the spine" requirement, Listing 1.00E1 provides that:

> Examination of the spine should include a detailed description of gait, range of motion of the spine given quantitatively in degrees from the vertical position (zero degrees) or, for straight-leg raising from the sitting and supine position (zero degrees), any other appropriate tension signs, motor and sensory abnormalities, muscle spasm, when present, and deep tendon reflexes. Observations of the individual during the examination should be reported; e.g., how he or she gets on and off the examination table.

The plaintiff has identified no clinical observations rising to this level.

3. With respect to the "motor loss" requirement, there is no evidence of atrophy with associated muscle weakness with "circumferential measurements of both thighs and lower legs" as contemplated by Listing 1.00E1. Furthermore, there is no evidence of significant muscle weakness. While Dr. Collis did mention some "loss of muscle strength" (AR, p. 235), on September 7, 2005,

Stephanie Wagner, M.D., examined the plaintiff and rated his lower extremity muscle strength as a 5 on the right and a 4 on the left (AR, p. 234). According to Listing 1.00E1, a 5 represents maximum strength.

    4. With respect to the "sensory or reflex loss" requirement, Mr. Gawienowski states as follows:

> Tests identifying sensory loss measure the ability to feel light touch, a pinprick, heat or cold. Sensory patterns can be variable. As a rule, reduced feeling or hypesthesia on the dorsum (top) of the foot is a common symptom of nerve root compression. Sensory deficit on the little toe and the lateral surface of the foot is more frequent with L5-S1 disease, and deficit on the big toe and medial aspect of the foot is more frequent with L4-L5 disease.
>
> Reflex loss can be identified by testing the deep tendon reflexes (DTRs), where tendons are tapped with a rubber reflex hammer. If there is nerve root compression in the lower back, there may be little or no reflex in either the knee (patellar tendon) or the ankle (Achilles tendon). There may be times where DTR test results are described as indicating reflex changes, illustrated by different findings for each leg, rather than reflex loss.

The plaintiff has shown no such documentation.

    5. The final requirement is evidence of a positive straight-leg raising test in both the sitting and supine positions. According to Ann Hirshman, <u>Medical Proof of Social Security Disability</u> § 2.5:

> The straight-leg raising test is as low-tech as it gets. Lie the patient down on his back and ask (or assist) him in raising one straight leg towards 90 degrees. Record the angle at which he reports pain (or refuses to move). Repeat with the other leg and then test each leg in the seated position. The test is positive if there is a disparity between the findings of the legs or of less than 90 degrees is reached.

While Dr. Collis observed "[s]traight leg raise elicits pain from the back down to the calf at 45 degrees" (AR, p. 235), he did not specify that this was from both sitting and supine positions.

9

Furthermore, Dr. Wagner apparently found that the plaintiff was negative for straight-leg raising from both the sitting and supine positions, to-wit (AR, p. 234):

> Straight leg raising -- supine (0 to 90 degrees)
>    Right 90 degrees, left 90 degrees (pain lower back)
> Straight leg raising -- sitting (0 to 90 degrees)
>    Right 90 degrees, left 90 degrees

6. The magistrate judge concludes that the plaintiff has failed to provide a "longitudinal clinical record" satisfying the duration and "Part A" severity requirements of Listing 1.04 and, hence, is not entitled to a conclusive presumption of disability at step 3 of the sequential evaluation process.

### **Operation of the Grid Rules in this Case**

The plaintiff has not worked since May 12, 2005, when he alleges he became disabled. He was last insured for Title II benefits on June 30, 2010. He was born on November 23, 1956. Therefore, he turned 50, and his age classification changed from "younger" to "closely approaching advanced age," on November 23, 2006. See 20 C.F.R. §§ 404.1563 and 416.963.

This case was denied at the fifth and final step of the sequential evaluation process based upon testimony from a vocational expert (VE). The VE testified that an individual capable of performing a limited range of light work would retain the ability to perform a significant number of light jobs in the national economy. In his written decision, the ALJ cited Grid Rules 202.21 and 202.14 as a framework for decisionmaking. See pages 5 and 6 of this report for a general discussion of how the grid rules operate in step 5 cases. Rules 202.21 and 202.14 contemplate an individual having a maximum exertional capacity for light work and who is younger and closely approaching advanced age, respectively. Both direct an ultimate finding of "not disabled." The corresponding

10

rules for an individual who is limited to sedentary work are Rules 201.21 and 201.14, and they direct a finding of "not disabled" and "disabled," respectively. Therefore, for the closed period from November 23, 2006, when the plaintiff turned 50, and February 19, 2010, when the ALJ rendered his decision, it is of dispositive significance whether the ALJ's finding that the plaintiff can perform light work (Finding No. 5) is supported by substantial evidence.

## **The ALJ's RFC Assessment**

The plaintiff contends that Finding No. 5 that he has the residual functional capacity (RFC) to perform light work is not supported by substantial evidence. "An ALJ considers numerous factors in constructing a claimant's RFC, including the medical evidence, non-medical evidence, and the claimant's credibility." *Coldiron v. Commissioner*, 2010 WL 3199693 (6th Cir.). Social Security Ruling (SSR) 96-8p codifies the so-called "narrative discussion" requirement as follows *(emphasis added)*:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, **citing specific medical facts** (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also **explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved**.

Therefore, we shall consider whether the ALJ's determination that the plaintiff can perform light work is adequately supported by the medical evidence, the non-medical evidence, and the ALJ's credibility assessment. Among other things, light work requires "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10. First, we shall consider

11

the medical evidence in support of the ALJ's RFC assessment for light work, particularly whether the evidence supports a finding that the plaintiff can stand/walk for six hours per workday.

## **The Medical Evidence**

As indicated above in our discussion of Listing 1.04, the chief medical evidence in support of the plaintiff's claim of disability due to degenerative disc disease of the lumbar spine consists of an MRI of the lumbar spine from August of 2005, which revealed, among other things, spinal stenosis at the L4-L5 and L5-S1 levels (AR, p. 275). On September 7, 2005, the plaintiff was examined at the request of the Commissioner by Stephanie Wagner, M.D. Dr. Wagner's narrative report is at AR, pp. 228-234. Dr. Wagner noted that "[t]he patient states that he has had a lumbar spine and MRI done recently, but we do not have the results of this imagining" (AR, p. 231). Accordingly, Dr. Wagner took an x-ray and found that the plaintiff's "lumbar spine done today did not show any acute fractures or gross abnormalities" (AR, p. 231).

On August 21, 2008, the plaintiff was examined at the request of the Commissioner by Mehmet Akaydin, M.D. (AR, pp. 279-287). Dr. Akaydin noted that "[t]here was no laboratory data or x-ray data obtained at present time" (AR, p. 284). Among other things, Dr. Akaydin opined as follows (AR, p. 285) *(emphasis added)*:

> Fully ambulatory both with and without the utilization of his wooden cane (primarily uses his cane whenever he has to walk longer distances as a simple precautionary measure against accidentally falling if his right leg suddenly gives out on him without any warning). He should be quite capable of performing most forms of at least minimally-to-mildly physically strenuous type work without any overt difficulty whatsoever especially those **jobs that are basically of a relatively sedentary and "sit-down" type nature** where he could put his fully intact cognitive/intellectual and extremity skills to good effective use while at the same time placing minimal physical stress/strain on his body as a whole and on his lower back region in particular.

12

On September 8, 2008, John Gedmark, M.D., found that the plaintiff can perform <u>medium</u> work. In support of his RFC, Dr. Gedmark uncritically summarized Dr. Akaydin's "recent physical findings," including the fact that "patient brought cane to examination but ambulation without cane was unremarkable" (AR, p. 297). However, when asked whether there are "treating / examining source conclusions about the claimant's limitations or restrictions which are **significantly different** *(emphasis added)* from your findings," Dr. Gedmark responded "yes," Dr. Akaydin's conclusions were different but "given little weight as it is not in keeping with all the evidence" (AR, p. 302). Dr. Gedmark did not indicate which specific "evidence" he had in mind. Nor is there any evidence that Dr. Gedmark was aware of the MRI findings from August of 2005.

The ALJ's RFC assessment is at pages 4 and 5 of his written decision (AR, pp. 32-33). The ALJ recited the findings from the MRI in 2005 in detail (AR, pp. 33 and 275) and then stated, somewhat abruptly, that "[h]owever, Dr. Wagner also noted in 2005 that the claimant was able to complete his activities without difficulty and could perform basic work activities such as sitting, standing, lifting, carrying and handling objects 'probably 25 to 75 pounds'" (AR, pp. 33 and 231). The magistrate judge concludes that, to the extent the ALJ was attempting to rely upon Dr. Wagner's findings in support of a conclusion that, notwithstanding the MRI results, the plaintiff can stand/walk for six hours per workday, the reliance was medically insubstantial because Dr. Wagner noted that "[t]he patient states that he has had a lumbar spine and MRI done recently, but we do not have the results of this imagining" (AR, p. 231).

Next, the ALJ observed that "[i]n 2008 Dr. Akaydin noted the claimant could perform most forms of at least minimally to mildly physically strenuous type work without any overt difficulty whatsoever" (AR, p. 33 and 285). The undersigned concludes that Dr. Akaydin's notation,

13

considered in its entirety, does not medically support a finding that the plaintiff can stand/walk six hours per workday because Dr. Akaydin's full notation is that the plaintiff could perform "most forms of at least minimally-to-mildly physically strenuous type work without any overt difficulty whatsoever **especially those jobs that are basically of a relatively sedentary and "sit-down" type nature** *(emphasis added)*." Admittedly, Dr. Akaydin did not directly state that the plaintiff is restricted to sedentary work. However, there was enough of a suggestion to that effect that Dr. Gedmark appeared to concede that his RFC, which permitted six hours of standing/walking per workday, was "significantly different" from Dr. Akaydin's (AR, p. 302). Yet neither Dr. Gedmark nor the ALJ offered a non-conclusory explanation of how these "material inconsistencies or ambiguities in the evidence in the case record were considered and resolved" as required by SSR 96-8p.

Finally, the ALJ observed that "[t]he scanty recent treatment notes after 2005 primarily consists of Park Duvalle's records in October and November 2008 and January 2009 for back pain or medication refills" (AR, p. 33). The undersigned concludes that this absence of evidence does not support a finding that the plaintiff can perform the standing/walking required of light work. In sum, the ALJ's decision failed to cite "specific medical facts" and explain how the tension between the findings of Drs. Akaydin and Gedmark was "considered and resolved" as required by SSR 96-8p. Hence, the ALJ's narrative discussion of his RFC assessment lacked a substantial medical basis.

We further conclude that the ALJ's RFC finding did not adequately take into account the medical evidence as a whole because in August of 2005, in addition to the MRI of the plaintiff's lumbar spine, an MRI was taken of his pelvis. Among other things, the pelvic MRI revealed the

14

presence of "probable bilateral trochanteric bursitis, left greater than right" (AR, p. 277). Neither the ALJ nor the medical sources mentioned by him in his written decision attempt to assess the effect of this finding, if any, upon the plaintiff's ability to stand/walk for six hours per workday.

In addition, the plaintiff's treating chiropractor, Robert Black, D.C., was of the opinion that degeneration of the L5-S1 joint limits the plaintiff to very little standing and walking (AR, p. 250). Although the regulations do not include chiropractors as acceptable medical sources, evidence from other sources, including chiropractors, may be used to show a claimant's ability to work. Hence, "the adjudicator generally should explain the weight given to opinions for these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-3p. Dr. Black's opinion was of case-dispositive significance. Yet it was not mentioned in the ALJ's written decision.

### **The Non-Medical Evidence and Credibility Assessment**

If a reviewing court determines that an ALJ's RFC assessment is unsupported by the medical evidence, the ALJ's consideration of the non-medical evidence and credibility assessment are particularly important because ALJ's are simply unqualified to interpret raw medical findings, such as the MRI from August of 2005, in functional terms. With respect to the credibility aspect of the ALJ's RFC assessment, SSR 96-7p provides as follows *(emphasis added)*:

> The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a **conclusory statement** that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility,

15

supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

In this case, the ALJ's written decision recounted the plaintiff's testimony at the administrative hearing as follows (AR, p. 33):

The claimant testified he has had worsening back pain since a motor vehicle accident in 2005. His legs give out without warning, and he uses a cane or crutches at times, spending most of the day sitting in a recliner watching television. His pain is constant and an eight to ten on a pain scale of one to ten. His son helps him getting in or out of a chair or tub. He can walk a half block on a good day.

The ALJ then proceeded with the following observations (AR, p. 33):

The Administrative Law Judge carefully observed the claimant and notes that he was not in any obvious pain or discomfort when walking in or out of the hearing room or while sitting during the course of the hearing.

The magistrate judge submits that these observations come uncomfortably close to an application by the ALJ of the old, now thoroughly-discredited "sit and squirm" test. See, for example, *Martin v. Secretary*, 735 F.2d 1008, 1010 (6th Cir., 1984) (disallowing "the dismissal of a claim for pain solely on the ALJ's observations at the hearing"). In any event, even if the ALJ was in a position to "observe" that the plaintiff has the RFC to perform sedentary work on a sustained basis, the issue in this case is the plaintiff's ability to perform light work. The magistrate judge concludes that the ALJ's credibility assessment was "conclusory" and did not satisfy the specificity requirement of SSR 96-7p. Therefore, the ALJ's RFC assessment lacked a substantial medical and non-medical basis.

## RECOMMENDATION

The magistrate judge RECOMMENDS that this matter be REMANDED to the Commissioner for a new decision containing a fresh RFC assessment and satisfying the "narrative discussion" and specificity requirements of SSR's 96-7p, 96-8p and 06-3p.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, any party shall have a period of fourteen (14) days, pursuant to Fed.R.Civ.P. 6(a), from the date of notice of electronic filing within which to file written objections to the foregoing report with the Clerk of the Court. Further and pursuant to Fed.R.Civ.P. 72(b), any party may file a response to objections filed by another party within fourteen (14) days after being served with a copy of said objections. A period of three days shall be added to each fourteen (14) day period above pursuant to Fed.R.Civ.P. 6(d), for a total of seventeen (17) working days.

The court shall not conduct a <u>de novo</u> review of objections that are general, conclusory, or merely adopt previous pleadings. The original objections shall be sent to the Clerk of Court either electronically or by mail. A copy of any objections and response thereto shall be served on the undersigned at Suite 330, 501 Broadway, Paducah, Kentucky, 42001 or via e-mail to w_david_king@kywd.uscourts.gov. Failure of a party to file timely objections shall constitute a waiver of the right to appeal by that party. *Thomas v. Arn*, 474 U.S. 140 (1985).